# UNITED STATES DISTRICT COURT
## for the
## Middle District of Tennessee

| | |
|---|---|
| United States of America<br>v.<br>**FADEL ALSHALABI**<br><br>*Defendant(s)* | Case No. 21-mj-1158 |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __August 30, 2019__ in the county of __Williamson__ in the __Middle__ District of __Tennessee__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 42 U.S.C. 1320a-7b(b)(2)(A) | Violation of the Anti-Kickback Statute |

This criminal complaint is based on these facts:
**See Attached affidavit**

☑ Continued on the attached sheet.

*Complainant's signature*

J. Trey Halterman, Special Agent, FBI
*Printed name and title*

Sworn to me remotely by telephone, in compliance with Fed. R. Crim. P. 4.1.

Date: July 2, 2021

*Judge's signature*

City and state: Nashville, Tennessee

U.S. Magistrate Judge Barbara D. Holmes
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, J. Trey Halterman, a Special Agent with the Federal Bureau of Investigation ("FBI"), being first duly sworn, hereby state as follows:

## AFFIANT'S BACKGROUND

1. I have been a Special Agent with the FBI since 2004. As part of my duties as a Special Agent, I investigate, among other things, criminal violations relating to health care fraud, wire fraud, mail fraud and other complex financial crimes. I have also received extensive training on complex financial crimes and gained experience in interviewing and interrogation techniques, the execution of federal search and seizure warrants, and the identification and collection of evidence. I have participated in numerous investigations involving health care fraud and conspiracies to commit health care fraud. I am currently assigned to the Memphis Division/Nashville Resident Agency White Collar Crime Squad. As a federal agent, I am authorized to investigate violations of laws of the United States.

2. I make this statement, in part, on personal knowledge based on my direct participation in this investigation, and in part, upon information learned during the course of this investigation from other sources to include other agents, witness interviews, records such as emails, bank records, and financial statements. I am familiar with the facts and circumstances of this matter and the assertions made in this affidavit are based on first-hand knowledge or information received during the course of the investigation. Unless otherwise noted, the referenced information was provided by a person who may have direct or hearsay knowledge of the statement. Except where indicated, all statements referred to below are set forth in substance and in part, rather than verbatim.

3. This affidavit is written in support of a criminal complaint charging FADEL ALSHALABI ("ALSHALABI") with the payment of illegal health care kickbacks, in violation of Title 42, United States Code, Section 1320a-7b(b) (Anti-Kickback Statute) and Title 18, United States Code, Section 2 (Aiding and Abetting).

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that ALSHALABI and others, known and unknown, committed the crime enumerated above in the Middle District of Tennessee, and elsewhere.

5. This affidavit does not contain all the facts of this investigation known to me or to other law enforcement personnel. Rather, it sets forth only those facts necessary to establish probable cause in support of this Criminal Complaint charging ALSHALABI with a violation of 42 U.S.C. § 1320a-7b(b).

## THE MEDICARE PROGRAM

6. The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS"). Individuals who received benefits under Medicare were referred to as "beneficiaries." Medicare was divided into multiple parts with separate coverages: Part A covered hospital inpatient care; Part B covered physicians' services and outpatient care; Part C covered Medicare Advantage Plans; and Part D covered prescription drugs.

7. Medicare Part C, also known as the Medicare Advantage Program, provided Medicare beneficiaries with the option to receive their Medicare benefits through a wide variety of private managed care plans, including health maintenance organizations ("HMOs"), provider

2

sponsored organizations ("PSOs"), preferred provider organizations ("PPOs"), and private fee-for-service plans ("PFFS"), rather than through the original Medicare program (Parts A and B).

8. Private health insurance companies offering Medicare Advantage plans were required to provide Medicare beneficiaries with the same services and supplies offered under Parts A and B of Medicare. To be eligible to enroll in a Medicare Advantage plan, a person had to have been entitled to benefits under Part A and Part B of the Medicare Program.

9. Physicians, clinics, and other health care providers, including laboratories, all of which provided services to Medicare beneficiaries, were able to apply for and obtain a "provider number." A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

10. A Medicare claim was required to contain certain important information, including: (a) the Medicare beneficiary's name and Health Insurance Claim Number ("HICN"); (b) a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (e) the name of the referring physician or other health care provider, as well as a unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI"). The claim form could be submitted in hard copy or electronically.

11. Medicare only paid for services that were medically necessary and reasonable, and which were actually provided as represented. Medicare did not pay claims that were procured based on the payment or receipt of kickbacks and bribes.

12. When a provider submitted a claim form to Medicare Part B, through Medicare's fiscal agents called Medicare administrative contractors, or to the Part C Medicare Advantage

3

program, the provider party certified that the contents of the claim form were true, correct, complete, and that the form was prepared in compliance with the laws and regulations governing the Medicare program. The submitting party also certified that the services being billed were medically necessary and were in fact provided as billed.

13. Medicare was a "Federal health care program" as defined in Title 42, United States Code, Section 1320a-7b(f), and a "health care benefit program" as defined in Title 18, United States Code, Section 24(b).

## THE ANTI-KICKBACK STATUTE

14. The Anti-Kickback Statute, Title 42, United States Code, Section 1320a-7b(b), prohibited knowingly and willfully offering, paying, soliciting, or receiving a kickback or bribe to induce or reward referrals or the arranging for referrals of items or services reimbursable by a Federal health care program. The Anti-Kickback Statute attaches criminal liability to parties on both sides of an impermissible "kickback" transaction. In doing so, it ensures that patient care is based on what is best for the patient and not upon the financial interest of the person or entity making or arranging for and receiving the referral.

## CANCER GENOMIC AND PHARMACOGENETIC TESTING

15. Medicare covered medical testing by clinical laboratories. Some examples of medical tests that fell within the purview of Medicare included:

16. Cancer genomic ("CGX") testing: CGX testing used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future. CGX testing was not a method of diagnosing whether an individual presently had cancer.

17. Pharmacogenetic ("PGX") testing detected specific genetic variations in genes that impacted the metabolism of certain medications. In other words, PGX testing helped

4

determine, among other things, whether certain medications would be effective if used by a particular patient.

18. For the purposes of this affidavit, CGX and PGX testing will be referred to collectively as "genetic tests" or "genetic testing."

19. Generally, in order to have one of the above-described tests conducted, an individual completed a DNA specimen collection by way of oral buccal swab. Specimens could also be obtained by blood sample. For purposes of this affidavit, samples or specimens will refer to the buccal swabs method. The specimen was then transmitted to a laboratory for testing. These were generally referred to as "samples."

20. Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." Title 42, United States Code, Section 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." Title 42, Code of Federal Regulations, Section 411.15(a)(1). Among the statutory exceptions Medicare covered were cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests." *Id.*

21. If diagnostic testing was necessary for the diagnosis or treatment of illness or injury, or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. Title 42, Code of Federal Regulations, Section 410.32(a) provided, "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and

who uses the results in the management of the beneficiary's specific medical problem." *Id.* "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

22. Because CGX testing did not diagnose cancer, Medicare only covered such tests in limited circumstances, such as when a beneficiary had cancer and the beneficiary's treating physician deemed such testing necessary for the beneficiary's treatment of that cancer. Medicare did not cover CGX testing for beneficiaries who did not have cancer or lacked symptoms of cancer.

## RELEVANT INDIVIDUALS AND ENTITIES

23. During the relevant time period, ALSHALABI was a resident of Charlotte, Union County, North Carolina.

24. Crestar Labs LLC, was a limited liability company organized under the laws of Tennessee with its principal place of business at 2001 Campbell Station Parkway, Suite C-2, Spring Hill, Tennessee 37174. Karemore Labs was a laboratory at 12091 Somerset Avenue, Princess Anne, Maryland 21853. ALSHALABI acquired Karemore Labs and utilized it to bill claims for services ostensibly provided by Crestar Labs, LLC, even though Karemore Labs did not perform genetic testing. ALSHALABI also utilized laboratories in Texas called Crestar Labs, which was also known as Martis Labs, and a laboratory called CrestarDX, both located at 1651 N. Collins Blvd., Richardson, Texas 75080. The headquarters for the Crestar-associated laboratories was the Spring Hill, Tennessee location, located within the Middle District of Tennessee.

25. Crestar Labs, LLC, Karemore Labs, and Martis Labs were Medicare providers. Crestar Labs, LLC, Karemore Labs, Martis Labs, and CrestarDX, hereinafter referred to

6

Case 3:21-mj-01158   Document 3   Filed 07/02/21   Page 7 of 20 PageID #: 9

collectively as "Crestar," purported to be a laboratory for genetic testing services. At all times relevant to this affidavit, ALSHALABI was the owner, operator, and Chief Executive Officer of Crestar.

26. For the majority of its genetic testing, Crestar utilized a reference laboratory to perform the actual genetic testing. Crestar billed Medicare for the services. Pursuant to Title 42, United States Code, Section 1833(h)(5)(A), referring laboratories were permitted to bill for tests performed by a reference laboratory so long as the referring laboratory met certain conditions.

27. Company #1 was a marketing company with its principal place of business in Belton, South Carolina. In particular, Company #1 was a marketing company that paid sales representatives to recruit Medicare beneficiaries for genetic testing services. Company #1's sales representatives obtained buccal swab samples and Medicare information from the beneficiaries and sold it to Crestar.

28. Individual # 1 was the owner of Company #1.

29. Employee #1 was a resident of Jupiter, Florida and an employee of Crestar.[1]

30. Company #2 was a company with its principal place of business in Glenview, Kentucky. Company #2 provided purported telemedicine services[2] to health care providers and beneficiaries. Company #1 paid Company #2 for signed doctors' orders for genetic testing for recruited Medicare and Medicaid beneficiaries, and then Company #2 provided the signed orders to Crestar on behalf of Company #1.

---

[1] Employee #1 has been charged in a different federal criminal case. Employee #1 was directly involved in the conduct as described herein.

[2] Telemedicine was a means via which doctors and patients could connect with each other through the use of telecommunication technology. Telemedicine companies provided telemedicine services to individuals by hiring doctors and other health care providers. Telemedicine companies typically paid doctors and medical providers a fee to conduct consultations with patients.

31. Individual #2 was the owner of Company #2.

## THE OFFENSE

32. On or about August 30, 2019, ALSHALABI knowingly and willfully offered and paid remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind to any person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, that is; ALSHALABI paid or authorized the payment of kickbacks and bribes to Company #1 via bank account transfers, to induce Company #1 and Individual #1 to refer individuals for genetic testing, resulting in the payment of Medicare reimbursements to Crestar, in violation of 42 U.S.C. § 1320a-7b(b)(2)(A), and 18 U.S.C. § 2.

## INVESTIGATION

33. ALSHALABI was identified during an ongoing investigation of false and fraudulent claims submitted to Medicare that sought reimbursement for laboratory testing services that were medically unnecessary and were procured through the payment of illegal health care kickbacks.

34. I know from my training and experience that certain Medicare providers, including laboratories that conduct genetic testing, engage in fraud by pushing genetic tests upon Medicare beneficiaries who do not have a medical need for these items or do not qualify for these tests under Medicare rules. The owners and operators of such laboratories often use doctors' groups and marketing groups to aggressively market genetic testing swab kits to Medicare beneficiaries, without regard to whether the tests are medically necessary or whether the beneficiaries qualify for the tests under Medicare rules.

35. Based on my training and experience, as an incentive to participate in the fraud, the owners and operators of the laboratories conducting the testing pay illegal kickbacks to the marketing groups in exchange for supplying beneficiaries for testing, typically on a per-sample basis. As part of this type of scheme, co-conspirators who operate telemedicine companies also often provide doctors to perform "consultations" or "consults" with Medicare beneficiaries to justify the issuance of a doctor's order for testing services. Based on my training and experience, I know that in many cases these doctors or medical providers do not actually perform the "consult" with the beneficiaries, as they are required to do under Medicare rules for services billed to Medicare and, instead, in exchange for an illegal kickback, authorize the tests without conducting valid examinations of the beneficiaries.

36. In this case, the investigation has revealed that Crestar submitted claims to Medicare for genetic testing of Medicare beneficiaries that were procured through bribes and kickbacks.

37. To submit genetic testing claims to Medicare, Crestar needed (a) beneficiaries with valid Medicare and Medicaid numbers who were willing to complete a genetic swab sample; and (b) prescriptions issued by doctors or medical providers[3] for the genetic testing, also known as doctors' orders.

38. The investigation has revealed that ALSHALABI was the owner and Chief Executive Officer of Crestar, and directly paid, or authorized the payment of, illegal kickbacks to marketing companies, including Company #1, in order to obtain completed genetic swab samples from Medicare beneficiaries and doctors' orders for diagnostic testing, and then submit false and fraudulent claims to Medicare.

---

[3] Other medical providers, such as physician assistants, can order genetic testing, but are subject to the same requirements as physicians. 42 C.F.R. § 410.32(a)(2).

9

39. ALSHALABI knew that Company #1 paid Company #2 illegal kickbacks for doctors' orders, because (1) Crestar employees introduced the two companies' owners to one another so that Company #1 would have a source of doctors' orders, (2) ALSHALABI previously contracted with Company #2 to directly pay for doctors' orders, and (3) ALSHALABI was aware Company #2 stopped providing doctors' orders to Company #1 when Crestar failed to pay Company #1 for swab samples.

40. ALSHALABI knew that Company #2 obtained the beneficiaries through other independent contractor marketers and sales representatives who solicited beneficiaries for the genetic testing services without regard to their medical necessity. These "marketers" and sales representative's targeted older individuals at nursing homes, pharmacies, senior fairs, public housing, among other places. Company #1, then obtained the doctors' orders for genetic testing by paying illegal kickbacks to Company #2, the purported telemedicine company.

**EVIDENCE OF ALSHALABI'S INVOLVEMENT IN GENETIC TESTING FRAUD**

41. In sum, ALSHALABI, and others at Crestar, billed Medicare for genetic testing for beneficiaries who were procured through the payment of illegal kickbacks to marketing companies, including Company #1.

42. Starting in 2016, ALSHALABI signed Medicare provider agreements in which he agreed, on behalf of Crestar, to abide by federal laws and Medicare regulations, including the Anti-Kickback Statute.

43. ALSHALABI contracted directly with Company #2 in April 2018. According to the terms of the contract, Crestar agreed to pay Company #2 a fee per referral of between $150 to $275 for genetic counseling and/or genetic testing orders. In reality, the intent of the contract was to pay for orders for genetic testing that Crestar would bill to federal health care programs,

including Medicare.

44. In 2018, ALSHALABI hired Employee #1 to be the Vice President of Sales for Crestar. ALSHALABI knew that Employee #1 was a felon who had previously been convicted on fraud charges.

45. In December 2018, Crestar, through the signature of Employee #1, contracted with Company #1 to conduct marketing through the use of independent contractor sales representatives.

46. Crestar and Company #1 initially contracted for payment to Company #1 based on a percentage fee per genetic test. The parties revised the contract numerous times over the course of November 2018 to at least July 2019, and eventually listed a "flat fee" in return for the marketing. However, the parties knew that the real purpose of the "flat fee" contract was to pay for each swab sample sent by Company #1 to Crestar.

47. Between November 2018 and at least July 2019, Crestar, as authorized by ALSHALABI, paid Company #1 based on the volume of swab samples sent by Company #1, billed by Crestar to Medicare, and reimbursed to Crestar by Medicare.

48. Crestar, including ALSHALABI and others, and Company #1, revised their contract multiple times in 2019 in order to adjust to the volume of swab samples sent by Company #1 to Crestar, that Crestar then billed to Medicare.

49. ALSHALABI and Employee #1, as well as others at Crestar, knew Company #1 paid its independent sales representatives to directly recruit Medicare beneficiaries to provide buccal swab samples for genetic testing, and knew Company #1 paid its sales representatives on a per swab basis.

50. With limited exceptions, the sales representatives for Company #1 were not

medical professionals, and yet, they conducted medical intakes on Medicare beneficiaries from whom they obtained buccal swabs, purportedly to screen the beneficiaries for medical necessity.

51. ALSHALABI and Employee #1, as well as others at Crestar, developed an online portal and process that included tracking referrals by marketing company and by marketing company sales representative. This was also tracked by Excel files. The purpose was to calculate the per swab sample payments owed to the marketing companies, including Company #1. It also allowed the marketing companies, including Company #1, to track payments per swab downstream to their sales representatives.

52. ALSHALABI, as well as others at Crestar, fielded frequent requests from Company #1 to recalculate the number of swab samples submitted by Company #1, and therefore the payment owed.

53. Individual #1, the owner of Company #1, complained via email multiple times to Employee #1 and ALSHALABI, and others at Crestar, that Crestar had not paid Company #1 based on the volume of swab samples sent from Individual #1 to Crestar.

54. Examples of communications between Company #1 and Crestar that discuss Crestar paying Company #1 for the volume of swabs, by swab, are as follows:

    a. On May 17, 2019, Employee #1 sent an email to Individual #1, copying ALSHALABI and others, and stated "[w]e understand your frustration with not being able to get your samples processed and paid in a timely manner . . . we advanced you $50K last week against your current billed samples so you could pay some of your reps."

    b. On May 17, 2019, Individual #1 responded to Employee #1 and others and asked Employee #1 to call Company #2 to tell them to "keep processing our swabs until

12

we get paid . . . they would get paid as soon as we did. I have already paid them for 29 consults for the money that we received from the lab for the 50,000." Employee #1 responded "Money's coming honey.." Based on my training and experience in these investigations, "consults" refers to paying for doctor orders.

c. On May 17, 2019, ALSHALABI, Employee #1, and others, canceled the contract with Company #1 and thereafter sent a new contract.

d. On May 21, 2019, an executive of Company #1 responded to ALSHALABI and Employee #1, and others, regarding the terms of the new contract. He stated that the "flat-fee payment" needed to be "more in line with our volumes" and Company #1 had "only been paid $50K on over 1200 submitted samples. . . ."

e. On May 21, 2019, an executive of Company #1 emailed ALSHALABI and Employee #1, and others, and complained about "not being paid on any of our samples" and stated "we need to be paid fairly for our volumes – past and future."

f. On June 6, 2019, Individual #1 emailed Employee #1 and stated that the second contract between Crestar and Company #1 was "flat" but worked out to $1,715 for 350 swab samples. Based on my training and experience and this investigation, I know that means the negotiated "flat fee" arrangement was to disguise the payment of $1,715 per swab samples up to 350 swab sample.

g. On June 8, 2019, Employee #1 emailed Individual #1, with ALSHALABI copied, and stated "[t]hank you for taking time to speak with Fadel [ALSHALABI] and I last evening . . . Fadel has agreed to pay you the $100k no later than the end of next week. . . we are going to send you the FLAT PAY AGREEMENT with a $600k payout. If your group should go over that amount each month we will

13

make additional $600K payments in that month."

h. On June 8, 2019, Individual #1 responded to ALSHALABI and Employee #1, and others, and stated "[n]o one could come close to us once we start money flowing to our agents . . . Not only do we have the trust with the Medicare Beneficiaries that we are talking to, we have access to EOB's from them if needed and of course we get referrals from them."

i. On June 14, 2019, an employee of Crestar emailed Individual #1, ALSHALABI, and Employee #1 with an Excel file attached tracking the samples to date from Company #1. The email stated:

- 116 Samples Paid to date
- $306,294.34 Collected
- 1,029 samples billed to date
- 913 samples pending at insurance

Later that same day, a Crestar employee sent an updated Excel file with the patient names included for tracking the swabs. The vast majority were Medicare beneficiaries.

j. On June 18 and 19, 2019, Individual #1 sent an email that Company #1 had stopped sending swabs to Crestar until they were paid. ALSHALABI responded that he would call.

k. On June 26, 2019, Individual #1 forwarded an email from one of Company #1's sales representatives to ALSHALABI and others stating "[p]lease get the money in the bank or we are all going to be in trouble." The forwarded email was from a sales representative stating that "I am owed for six swabs" and threatening to go to the Alabama Secretary of State if she is not paid.

l. On July 24, 2019, Individual #1 forwarded an email from one of Company #1's

14

sales representatives to ALSHALABI and others stating "I wanted to forward you this email from one of our agents. We are being bombarded with things like this. Tomorrow is going to be worse." The forwarded email was from a sales representative stating in part "I know I don't know all the in between's and all the background of what you have to go through but that's not our issue as agents in the field we swab and want to get paid."

55. Crestar employees provided spreadsheets to Company #1 that reflected the volume of swab samples, payment by Medicare to Crestar for the genetic testing associated with those swab samples, and the amount of payments owed to Company #1 in exchange for the swabs.

56. ALSHALABI and Employee #1, as well as others at Crestar, knew Company #1 paid Company #2 to provide signed doctor orders for genetic testing, and paid on a per order basis. Company #1 provided those signed orders directly to Crestar. Crestar also obtained them directly from Company #2 via drop box.

57. In most cases, the physician or medical providers who reviewed and signed the genetic testing orders did not examine, consult, or speak to the patients directly. Instead, they reviewed notes through an electronic portal and/or drop box, and signed orders for the genetic tests.

58. Often, the beneficiaries never received the results of the genetic testing conducted by Crestar and billed to Medicare.

59. On May 23, 2019, Individual #2, the owner of Company #2 visited Crestar in Spring Hill, Tennessee. Crestar employees regularly communicated with Individual #2 about doctors' orders for genetic.

15

# EVIDENCE OF ALSHALABI'S CONTROL OF CRESTAR AND AUTHORIZATION OF PAYMENTS

60. At all times relevant to this affidavit, ALSHALABI was the owner and Chief Executive Officer of Crestar. In that role, ALSHALABI was in control of the decisions on behalf of Crestar.

61. As early as 2016, ALSHALABI recruited investors into his laboratory ventures. Thereafter, he provided regular updates to the investors on the operations of the laboratory. For example:

   a. On May 13, 2017, ALSHALABI sent an email from his personal email account to investors with the subject line "Crestar Lab progress" (sic) in which he wrote, "The good news is I decide to bring an account with 2000 samples but we will not get pay for it at least 90 days, and will be more good news in the coming weeks. We need to take the lab to the next level…"

   b. On October 13, 2017, ALSHALABI sent an email with the subject line "Q3 Investors News Letter." ALSHALABI described that on September 22, a regional sales specialist was hired. ALSHALABI "assisted her in signing a few new clinics which has now already started sending in their samples to the lab." In the same email, ALSHALABI wrote, "The lab has already started receiving DNA samples from the group in Florida that is estimated to reach a thousand samples in the next 60 days. In March I was able to create and support this group with an office and training including financial needs and now this group is sending account every week with DNA samples." He noted in reference to Medicaid[4] payments that "commission was paid according to old contracts and agreements

---

[4] Medicaid is also a "federal health care program"

with marketing groups." Summarizing his email, he wrote, "I work very hard and relentlessly towards the success of this lab…"

62. During the course of the investigation, Agents interviewed Crestar employees, Crestar contracted marketers, and business associates. Generally, the individuals advised that ALSHALABI was in charge. They met with ALSHALABI during their hiring process, followed his guidance during the performance of their work, including sending payments to marketing companies, met with or spoke to ALSHALABI during contract negotiations, or spoke to him directly regarding their interactions supporting Crestar's operations. For example:

    a. Agents interviewed Employee #2, who had worked in the lab industry since 1970. Employee #2 applied to Crestar for a lower level position, but because of his experience was interviewed for a more senior position. During his hiring process he met with senior Crestar manager, including ALSHALABI. He was eventually hired as Operations and Corporate Sales.

    b. Agents interviewed Employee #3. Employee #3 was a technical supervisor and worked at the lab before it was purchased by ALSHALABI. Among other things, Employee #3 referred to ALSHALABI and his two senior executives, including Employee #1, as the "three amigos" who made all the hiring decisions. She also recalled a time where she raised concerns to ALSHALABI and Employee #1 regarding a marketing group soliciting samples door-to-door. The marketing group was terminated, but later reinstated.

    c. Agents interviewed P.S., the owner of a business that supported Crestar's claims submission process. P.S. recalled a meeting he attended at Crestar that involved employees from his company, Crestar's lab director, an unidentified individual he

17
Case 3:21-mj-01158   Document 3   Filed 07/02/21   Page 18 of 20 PageID #: 20

had never met before [Al LNU], and ALSHALABI. P.S. described the unidentified individual as aggressive. At one point during the meeting, P.S. asked the unidentified individual what his purpose was in the meeting and the nature of his relationship with Crestar. ALSHALABI responded to the question and advised that the individual was in marketing development.

d. Agents interviewed Employee #4. Employee #4 worked in Crestar's Spring Hill, Tennessee facility and was employed by Crestar from approximately March 2019 to March 2020. One of Employee #4's responsibilities was bookkeeping. Her duties included sending payments to marketers, including from JPMorgan Chase Bank Account No. x0839. Employee #4 advised that no payment went out of Crestar without ALSHALABI telling her to do so via text, email, or by phone, including the payments to the marketers. Employee #4 also advised that payments to marketers were not generally based on invoices from marketers, rather, ALSHALABI provided her with a list of marketer names and payment amounts.

e. According to Employee #4, she sent the payments from Crestar Labs headquarters in Spring Hill, Tennessee, where she had her office, and occasionally from Employees #4's residence. Both the Crestar headquarters and Employee #4's residence are located in the Middle District of Tennessee. There were a limited number of occasions she could recall that she sent payments while working at Crestar's Texas location, but "95%" were sent directly from the headquarters or her residence, located in the Middle District of Tennessee. Based on a review of

18

her travel records, Employee #4 stated that she was in the Middle District of Tennessee on or about August 30, 2019.

63. A review of the bank records from numerous Crestar and ALSHALABI related bank accounts showed payments to marketing companies, including Company #1. These payments reflect hundreds of thousands of dollars in payments.

64. On or about August 30, 2019, Crestar, authorized by ALSHALABI, paid Company #1 $70,000 for "marketing fee."

65. In the period of December 2017 through the present, Crestar billed Medicare approximately $86 million for genetic testing. Crestar was paid approximately $13.9 million for those claims.

## **CONCLUSION**

66. Wherefore, based upon the information in Paragraphs 1 through 65, I respectfully submit that there is probable cause to believe that, in the Middle District of Tennessee and elsewhere, ALSHALABI did knowingly and willfully pay an illegal health care kickback, in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A) (Anti-Kickback Statute) and Title 18, United States Code, Section 2, to wit:

| Count | Bank Account | On or About Date | Amount | For | Recipient |
|---|---|---|---|---|---|
| 1 | JPMorgan Chase x0839 | 8/30/2019 | $70,000 | "Marketing fee" | Company #1 |